**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

**VASYL MICHAEL HARIK,**

        **Plaintiff,**

**v.**                                                                 **Civil Action No. 4:06cv56**

**NATIONAL AERONAUTICS AND
SPACE ADMINISTRATION,**

        **Defendant.**

## OPINION and ORDER

_____This matter comes before the court on the defendant's, National Aeronautics and Space Administration ("NASA"), motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), or in the alternative 12(b)(6), or for summary judgment pursuant to Rule 56, filed on June 1, 2006. After considering the submitted memoranda and exhibits, the court determines that a hearing is not necessary for the resolution of the issues presented.  For the reasons stated fully herein, the court **GRANTS** the defendant's motion for summary judgment.

### I. Procedural History

On July 12, 2005, the plaintiff, Vasyl Michael Harik, filed a complaint against defendant, NASA, in the United States District Court for the District of Columbia alleging hostile work environment based on his national origin and discriminatory or retaliatory discharge related to his employment. On March 16, 2006, the plaintiff's case was transferred to this court. On June 1, 2006, NASA filed the instant motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), or in the alternative 12(b)(6), and for summary judgment, with required Roseboro notice attached. On

June 19, 2006, the plaintiff filed his response in opposition subject to defect for failing to include an original signature. On June 26, 2006, NASA filed its reply. Subsequently, the plaintiff submitted a "Response to Oppose the Defendant's Reply in Support of Summary Judgment", which was not filed because the plaintiff did not receive leave of court to file his additional response. On July 11, 2006, the defendant filed a motion to strike the plaintiff's response to its reply.

## II. Factual Background

The plaintiff claims that NASA discriminated against him based on national origin in violation of Title VII of the Civil Rights Act of 1964. See 42 U.S.C. §§ 2000e-1 - 2000e-17. Specifically, the plaintiff claims hostile work environment based on his national origin and discriminatory or retaliatory discharge related to his employment.

The plaintiff, a structural engineer, was affiliated with NASA from October 2000 to April 2004 as an employee of NASA contractors which were hired by NASA to perform particular projects. From 2000 to 2002, the plaintiff worked for ICASE Institute, and from 2002 to 2004, he worked for Swales Aerospace ("Swales"), both of which were NASA contractors. Although the plaintiff recognizes that he was officially employed by these contractors, and even states in his deposition that he was an employee of Swales and ICASE Institute, he contends that he was also a contingent employee of NASA for purposes of Title VII. Specifically, the plaintiff claims that he was a NASA contingent employee because he physically worked at the NASA Langley Research Center ("NASA Langley"), NASA controlled many aspects of his work, and was effectively responsible for terminating his employment.

The plaintiff's national origin is Ukranian. The plaintiff claims that there was a general "culture of contractor mistreatment" at NASA Langley, but that his mistreatment and harassment

2

were more severe because of his national origin. (Compl. at 1.) The plaintiff claims that the discrimination began with "prolonged accentuated mispronunciations and misspelling of [his] name," but later became more offensive when he heard phrases such as "useless Russian approach", "a foreigner", "proletariat classification" of materials, "disastrous work", "you should off [sic] been a plumber back at home", and "not American". (Id.) Furthermore, the plaintiff claims that co-workers would sometimes mistake his origin as Russian, instead of Ukranian. For the most part, the plaintiff is not specific as to who made these comments and the circumstances in which they were uttered. However, he claims that the phrases were "accompanied with a negative connotation and hostile demeanor." (Id.) The plaintiff claims that this resulted in a hostile work environment.

Most of the plaintiff's claims revolve around one particular NASA civil service employee, Dr. Thomas Gates, who was also an engineer and a technical monitor for the plaintiff. The plaintiff claims that Dr. Gates obstructed his opportunities to participate in conferences, insulted and sabotaged his work, and made comments that the plaintiff was not a good choice to represent NASA in contrast to a U.S.-born contractor. However, the plaintiff does not give any specifics about such comments and focuses on one particular U.S.-born contractor who Dr. Gates mentored, as discussed below.

In January 2001, while working for ICASE Institute, the plaintiff claims that the paperwork that he had submitted for the approval of his abstract for a June 2001 conference disappeared after he had submitted it to the NASA branch. The plaintiff claims that "the branch secretary was saying: 'I am not serving these foreigners [sic] contractors.'" (Id.) However, the plaintiff does not elaborate as to who this secretary was, to whom he or she made this comment, or the circumstances surrounding the statement. The plaintiff claims that Dr. Gates said that he would handle the

plaintiff's abstract approval, but that "no records could be found" and that the plaintiff's efforts to participate in the conference were blocked. However, the plaintiff claims that Dr. Odegard, a U.S. born contractor and Dr. Gates' "Post Doc"[1], was allowed to pursue the same conference opportunity. In relation to this claim, the plaintiff contends that at a pre-conference meeting, Dr. Nemeth, another employee of NASA, said "now, we've broken your spirit so you'll do what we tell you." (Id.)

In the summer of 2001, the plaintiff claims that he was again discriminated against by Dr. Gates when Dr. Gates assigned only Dr. Odegard and Dr. Glaessgen of NASA to organize and lead sessions at the 2002 AIAA SDM Conference, even though the plaintiff had expressed an interest and felt he had appropriate experience. The plaintiff claims that, at one point, Dr. Glaessgen included the plaintiff in the informal organizational meetings for these sessions, and that such inclusion was reflected in the papers produced from the meetings. However, the plaintiff claims that Dr. Gates repeatedly excluded the plaintiff's name when referring to the informal meetings. The plaintiff claims that this omission made him feel as if his input was not welcome or needed.

The plaintiff claims that in August 2001, Dr. Gates' daily display of favoritism towards Dr. Odegard became worse when the plaintiff was moved to work in the same room as Dr. Odegard. However, the plaintiff does not mention any specifics. Furthermore, the plaintiff claims that in January 2002, Dr. Gates pushed for a mid-year promotion and salary increase for Dr. Odegard, but that the plaintiff received an increase in salary only after raising the issue with the NASA branch head.

In January 2002, the plaintiff claims that he finished an AIAA conference paper which

---

[1] The plaintiff repeatedly refers to Dr. Odegard as Dr. Gates' "Post Doc". The court assumes that the plaintiff is referring to Dr. Odegard's educational level and that Dr. Odegard was Dr. Gates' apprentice.

included Dr. Gates and Dr. Nemeth's names as authors, but that they withheld contributing any of their own writings to it for a year, even though the plaintiff was ready to proceed with publication. The plaintiff told Dr. Nemeth that the plaintiff could remove Dr. Nemeth's name from the paper if he could not contribute something to the paper on time. In response, the plaintiff claims that Dr. Nemeth made "a nasty scene in [the plaintiff's] office with derogatory language." The plaintiff also claims that Dr. Gates made derogatory comments when it became clear that Dr. Gates was not going to be a co-author on another symposium paper that the plaintiff wrote with Dr. Sarah Franklin. The plaintiff claims that Dr. Gates later called the plaintiff's paper "trash" and a "disaster", even though the plaintiff's paper was later published in a scientific journal.

In May 2002, the plaintiff and Dr. Gates had another dispute when Dr. Gates put his name on one of the plaintiff's conference papers and then "grossly misrepresented" [the plaintiff's] productivity to the NASA branch head, Dr. Damodar Ambur. The plaintiff claims that Dr. Gates argued to Dr. Ambur to withdraw the plaintiff's research funding from ICASE Institute due to the plaintiff's poor technical performance. Dr. Ambur discussed the issue with the plaintiff and decided to terminate the research funding. Dr. Ambur called Dr. Manuel Salas, the ICASE Director, and told him about the withdrawal of the funding and the termination of the plaintiff's project. In response, Dr. Salas terminated the plaintiff from ICASE Institute.

After being terminated from ICASE Institute, the plaintiff received a position with another NASA contractor, Swales Aerospace. In his new position, the plaintiff also worked with Dr. Gates. The plaintiff claims that over the course of his employment, he was denied several opportunities to participate in professional conferences. However, Dr. Odegard, Dr. Gates' U.S.-born Post Doc, was allowed to participate. Furthermore, the plaintiff claims that at one particular conference, his name

5

was removed from a talk covering his research, and that at another workshop, his participation as a co-author "was publicly obstructed with a very damaging claim of [his] false authorship." (Id. at 3.) The plaintiff also claims that when a distinguished scientist attended a particular conference at NASA, Dr. Gates did not allow the plaintiff to speak extensively with the scholar, even though the plaintiff had had a previous working relationship with such scholar.

The plaintiff claims that even the "polite religious advisor, Dr. Everett," who called for prayers before NASA gatherings, made the following comment: "You know, the end of the Cold War brought a lot of hardship and suffering to many people here." The plaintiff claims that the sentiment that Dr. Everett was trying to express was that the plaintiff was guilty of benefitting from the end of the Cold War.

The plaintiff also claims that his work was sabotaged because, from September 2002 to April 2003 and again in March 2004, he was denied access to particular commercial software that the plaintiff claims he needed to do his job. The plaintiff claims that Dr. Odegard was provided with such software and that Dr. Gates coordinated the software distribution.

The plaintiff claims that all of the above incidents resulted in a hostile work environment. The plaintiff claims that such incidents also negatively affected his safety. Specifically, the plaintiff claims that when he complained that he felt that there was an "irritant aerosol" in the air around his work at NASA, he received little cooperation. Specifically, the plaintiff claims that he complained to John Mitchell, Swales' safety officer, and filed a safety report to address the situation. The plaintiff also complained to Mr. Zeitman, NASA's security and safety officer, but did not file an official safety complaint with NASA. However, it is undisputed that both Mr. Mitchell and Mr. Zeitman did conduct some sort of investigation into the matter, even if the plaintiff believes that it

was not a sufficient investigation. Furthermore, at the end of April or early May 2003, after the plaintiff complained of "irritant aerosols" in his office, he was moved to a different office at  NASA Langley to address the alleged problem.  In addition, in February 2004, when the plaintiff began to complain of "irritant aerosols" at his new office and of harassment by Dr. Gates, the plaintiff was moved once again to a different office to try to accommodate him.

Beginning in January 2004, the plaintiff began to take excessive amounts of sick leave. In the first six weeks of 2004, the plaintiff averaged approximately thirty-five hours of sick leave per week without a sufficient doctor's note. However, his immediate supervisor had signed off on his sick leave.  The Swales Director of Human Resources, Pam Butziger, met with the plaintiff to discuss his absences.  The plaintiff informed Butziger that he was experiencing stress at work, and that Dr. Gates had withheld software from him that he needed to perform his tasks.

In response, Andrew Srokowski, the Program Manager for Swales Aerospace, spoke with Pam Butziger and John Mitchell, the Systems Engineering Department Manager, to determine how to address the plaintiff's concerns. Srokowki decided to speak with Dr. Ambur, a NASA employee and potential witness to the interactions between the plaintiff and Gates, to determine if there had been any harassment.  Srokowski talked to Dr. Ambur over the course of several weeks and Dr. Ambur confirmed that the plaintiff had access to any necessary software, and that Dr. Gates had not engaged in any mistreatment of the plaintiff.  Furthermore, Srokowski made sure that  copies of the software were provided by NASA. In addition, Srokowski spoke with Allan Waters, the technical lead for the Swales tasks at Lockhead Martin, who had also had contact with the plaintiff and Dr. Gates and had not observed any mistreatment of the plaintiff.

However, the plaintiff felt that his internal complaints had had no effect on the situation.

Thus, in February 2004, he initiated a discrimination review with the NASA Langley Office of Equal Opportunity ("NASA EEO office").  He did not file a formal complaint at this time.  In response, the NASA EEO office conducted a limited jurisdictional inquiry to determine if the plaintiff was an employee of NASA for Title VII purposes.  The NASA EEO office reviewed the plaintiff's situation using the contingent worker factors set forth in the NASA and EEOC guidelines. The EEO office determined that the plaintiff was not an "employee" of NASA and informed him of his right to file a formal complaint with the NASA EEO office.

The plaintiff contends that after hearing his claims, the Swales Human Resource Director and the NASA EEO counsel agreed that there was sufficient evidence to file an EEO complaint. However, the plaintiff claims that after a meeting between Swales and NASA management, the companies started to deny any of the plaintiff's problems and tried to pressure him into stopping the EEO process. The plaintiff does not provide any specifics as to any such meeting or how he believes management pressured him, other than the fact that Andrew Srokowski, Program Manager for Swales, contacted him to try to resolve the plaintiff's issues.

Specifically, on March 10, 2004, Srokowski, who had never met with the plaintiff before, met with the plaintiff to discuss his concerns. Srokowski also discussed the fact that the plaintiff had been using excessive sick leave, and was now using vacation time to cover his absences. Srokowski told the plaintiff that if he continued to work so few hours that he would have to go on part-time status. The plaintiff declined to apply for disability leave. Srokowski also told the plaintiff that he would follow up with Dr. Ambur about the plaintiff's access to any necessary software. On March 19, 2004, Srokowski received an email from the plaintiff in which the plaintiff expressed his dissatisfaction with Srokowski's proposed actions and requested permission to telecommute to work.

Srokowski responded to the email by asking the plaintiff to meet with him the following Monday and to bring a progress report of the plaintiff's work activities. The plaintiff did not respond to this email and did not show up for the meeting. The plaintiff claims that he did not receive the email until the Wednesday after the appointed meeting date, but admits that even after receiving it, he did not respond to Srokowski's email. The plaintiff contends that he took offense that a level-3 manager would ask for a progress report and not his immediate supervisor. The plaintiff explains that he thought it was belittling that Srokowki would contact him since the plaintiff already talked to his immediate supervisor, Vaughn Behun, everyday. Therefore, he did not think that it was necessary to respond to Srokowski.

On March 24, 2004, Srokowski sent another email to the plaintiff, this time directing the plaintiff to meet with him the following Monday, March 29, 2004, and to bring his reports. On the morning of Monday, March 29, 2004, the plaintiff did not appear for the meeting, but emailed Srokowski a report for only one of his projects. Furthermore, the plaintiff resigned from another one of the NASA projects to which he was assigned. The plaintiff did not have authority to resign from such project.  On March 30, 2004, Srokowski responded to the plaintiff's email asking whether the plaintiff was refusing to meet with Srokowski. Furthermore, Srokowski informed the plaintiff that he had only provided him with one of his requested reports, and that Srokowski meant for the plaintiff to include all of his work activities. In a subsequent email, Srokowski stated that he wanted the reports by close of business March 30. However, the plaintiff responded accusing Srokowski of micro-managing him and promoting a hostile work environment. Furthermore, the plaintiff told Srokowski that if he could not help to resolve the plaintiff's problems, then Srokowski should not disrupt the plaintiff's current task. After receiving this email, Srokowski discussed the matter with

Pam Butziger, the Director of Human Resources for Swales. On April 5, 2004, Srokowski terminated

the plaintiff for gross misconduct based on his insubordination.

On June 21, 2004, the plaintiff filed a formal complaint against NASA alleging that he

suffered a hostile work environment based on his national origin and that NASA retaliated against

him for his prior claims of discrimination. On October 14, 2004, six months after his termination,

the plaintiff filed a discrimination complaint against Swales with the Virginia Council on Human

Rights ("VCHR") and the  Equal Employment Opportunity Commission ("EEOC"), also alleging

unlawful discrimination based on national origin and retaliation. On January 31, 2005, the EEOC

issued a dismissal and right to sue letter to the plaintiff with regard to his Swales complaint. On

March 9, 2005, the NASA EEO Office issued a notice upholding its earlier determination that it did

not have jurisdiction over the plaintiff's claim because the plaintiff was not an employee of NASA.

On May 2, 2005, the plaintiff filed suit in the United States District Court for the District of

Maryland against Swales and two of its officers alleging discrimination based on national origin and

retaliation.[2] On July 12, 2005, the plaintiff filed the instant action against NASA in the United States

District Court for the District of Columbia.

The plaintiff has been unemployed since his termination with Swales. The plaintiff asks for

injunctive relief, back pay, reinstatement of his job or $330,000 for the equivalent of a three year

contract, loss of earning power and professional standing in the amount of $300,000, pain and

suffering in the amount of $250,000 "per year or per  quarter of mistreatment", costs and attorney's

fees, and a written apology from each NASA manager involved. (Id. at 6.)

---

[2]The suit against Swales is currently pending in the District of Maryland.

III. Standard of Review

In this case, the defendant has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), or in the alternative 12(b)(6), or for summary judgment pursuant to Rule 56. For the reasons set forth below, this court finds that the defendant's motion for summary judgment is the most appropriate motion for this case.

The defendant's initial argument is that the plaintiff's claims should be dismissed under Rule 12(b)(1) because this court lacks subject matter jurisdiction. Specifically, the defendant argues that "to have jurisdiction over the subject matter of this case, the court must first find that the government's waiver of sovereign immunity for Title VII claims reaches the plaintiff." In order to make such a finding, the plaintiff must be an "employee" of NASA for purposes of Title VII. However, the defendant claims that the government's waiver of sovereign immunity for Title VII does not reach the plaintiff, and this court does not have jurisdiction over this case, because the plaintiff was an employee of Swales and ICASE Institute, not NASA.

Title VII defines an "employee", as "an individual employed by an employer", which is not specific enough to assist this court in determining whether the plaintiff is an employee of NASA. 42 U.S.C. § 2000e(f). However, the Supreme Court has held that "Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322-23. (1992). In Spirides v. Reinhardt, 613 F. 2d 826, 831 (D.C. Cir. 1979), the D.C. Circuit addressed the issue of whether a plaintiff was an employee of a federal agency. In Spirides, the D.C. Circuit formulated a test for determining whether a plaintiff was an employee or an independent contractor for purposes of Title VII; the Fourth Circuit subsequently adopted this test in Garrett v. Phillip Mills, Inc., 721 F. 2d 979 (4th Cir. 1983).

11

Under the <u>Spirides</u> test, "the extent of the employer's right to control the 'means and manner' of the worker's performance is the most important factor to review." <u>Spirides</u>, 613 F.2d at 831. However, the court should also consider the following other factors:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

<u>Garrett v. Phillips Mills, Inc.</u>, 721 F.2d 979, 982 (4th Cir. 1983) (citing <u>Spirides</u>, 613 F.2d at 832).

However, the Fourth Circuit has also held that "[w]hen a factual attack on subject matter jurisdiction involves the merits of a dispute,  '[t]he proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case.'" <u>United States v. North Carolina</u>, 180 F.3d 574, 580 (4th Cir. 1999) (quoting <u>Garcia v. Copenhaver, Bell & Assocs.</u>, 104 F.3d 1256, 1261 (11th Cir.1997) (explaining that courts should "refus[e] to treat indirect attacks on the merits as [Federal Rule of Civil Procedure] 12(b)(1) motions") (second alteration in original) (internal quotations omitted). "This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) . . . or Rule 56 . . . both of which place great restrictions on the district court's discretion." <u>Garcia</u>, 104 F.3d at 1261 (quoting <u>Williamson v. Tucker</u>, 645 F.2d 404, 415-16 (5th Cir. 1981), <u>cert. denied</u>, 454 U.S. 897 (1981)).

12

In the instant case, the court finds that the question of whether the plaintiff is an employee of NASA is too closely related to the merits of the plaintiff's case to resolve on a Rule 12(b)(1) jurisdictional motion. In fact, the issue of whether the plaintiff is an employee of NASA is an essential element of the plaintiff's claims under Title VII. Accordingly, the court must refrain from applying the Spirides test to the defendant's Rule 12(b)(1) motion, find that jurisdiction exists, and address the defendant's objection as an attack on the merits of the plaintiff's claim. Because the parties have submitted exhibits along with their briefs, and the parties have been notified that the defendant's motion may be addressed as a motion for summary judgment, the court will address the defendant's objection as a motion for summary judgment under Rule 56.

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the non-moving party, determines that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986); Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985). The court must assess the evidence and draw all permissible inferences in the non-movant's favor. See Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Nevertheless, the non-movant must make a sufficient evidentiary showing on each element of his claims such that a jury could reasonably find in his favor. Celotex, 477 U.S. at 322. While it is the movant's burden to show the absence of a genuine issue of material fact, Pulliam Investment Co., Inc. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987), it is the non-moving party's burden to establish its existence. Matsushita Elec. Indus., 475 U.S. at 585-87.

13

The non-moving party may survive a motion for summary judgment by producing "evidence from which a [fact finder] might return a verdict in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).   The evidence that the non-moving party presents to this end must be more than a "mere scintilla." Barwick v. Celotex Corp., 736 F.2d 946, 958-59 (4th Cir. 1984).   In order for the non-moving party to survive summary judgment, he must present evidence that is "significantly probative." Celotex Corp., 477 U.S. at 327.   If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment must be granted. Anderson, 477 U.S. at 249-50.   District courts have an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323-25).

When the motion is supported by affidavits, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. See Cray Communications Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 393-94 (4th Cir. 1994).   The plaintiff, however, may not create an issue of fact by submitting an affidavit that is inconsistent with her prior deposition testimony. See Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990).

Summary judgment does not require that no factual issues be in dispute.   To find against the moving party, the court must find both that the facts in dispute are material and that the disputed issues are genuine.   Only "facts that might affect the outcome of the suit under governing law" are material. Anderson, 477 U.S. at 248.   A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. Thus, Rule 56 mandates summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

14

of proof at trial." <u>Celotex Corp.</u>, 477 U.S. at 322. "In such a situation, there can be 'no genuine

issue as to any material fact,' since a complete failure of proof concerning an essential element of

the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u> at 322-23.

IV. Discussion

The plaintiff claims that NASA has discriminated against him based on national origin in

violation of Title VII of the Civil Rights Act of 1964. <u>See</u> 42 U.S.C. §§ 2000e-1 - 2000e-17.

Specifically, the plaintiff claims that he suffered a hostile work environment and that he was

terminated based on his national origin and in retaliation for filing an EEO complaint. The plaintiff

may avert summary judgment by forecasting any direct or indirect evidence of the discriminatory

animus at issue. <u>Brinkley v. Harbour Recreation Club</u>, 180 F.3d 598, 607 (4th Cir. 1999). To this

end, the plaintiff must forecast "evidence of conduct or statements that both reflect directly the

alleged discriminatory attitude and that bear directly on the contested employment decision." <u>Fuller</u>

<u>v. Phipps</u>, 67 F.3d 1137, 1142 (4th Cir. 1995).

Alternatively, if such evidence is not available, the plaintiff may rely on the flexible burden-

shifting scheme of circumstantial proof articulated by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S.

792 (1973), and its progeny. <u>Brinkley</u>, 180 F.3d at 607.[3]   The Supreme Court, in <u>McDonnell</u>

---

[3] The court does recognize that, despite a lack of direct evidence of discrimination, the plaintiff might have proceeded under a mixed-motive theory as the method of proof by which to state his claims. A plaintiff proceeding under the mixed-motive theory must present sufficient direct or circumstantial evidence for a reasonable jury to conclude that discrimination or retaliation was a motivating factor for any adverse employment practice. <u>See</u> <u>Hill v. Lockheed Martin Logistics Mgmt. Inc.</u>, 354 F.3d 277, 284-85 (4th Cir. 2004); <u>Desert Palace Inc. v. Costa</u>, 539 U.S. 90, 102 (2003). However, the plaintiff provides no analysis or support for proceeding under this theory and appears to argue only that his employer's stated reason for firing him was a pretext for discrimination. Accordingly, the court will not consider the plaintiff's claims under the mixed-motive theory.

15

<u>Douglas</u>, noted that "the facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations." <u>Id.</u> at 802 n.13.  Accordingly, courts have modified the <u>McDonnell Douglas</u> framework to address a wide range of discrimination claims.  Thus, the plaintiff must first state a prima facie case of hostile work environment based on his national origin and discriminatory or retaliatory discharge.

If the plaintiff succeeds in presenting a prima facie case, an inference of discrimination arises and the defendant faces a burden of production to articulate a legitimate non-discriminatory reason for the alleged discriminatory actions.  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802.  Once such a reason is provided, the presumption of discrimination falls away completely, and the plaintiff must present evidence that the reason given was a pretext and that the defendant intentionally discriminated against the plaintiff.  <u>See</u> <u>Mackey v. Shalala</u>, 360 F.3d 463, 469 (4th Cir. 2004).  This burden of establishing pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination."  <u>Texas Dept. of Comm. Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981).  Without sufficient evidence to permit a rational fact finder to conclude that the stated reason is a pretext for retaliatory or gender discrimination, the defendant is entitled to summary judgment.  <u>Karpel v. Inova Health Sys. Servs.</u>, 134 F.3d 1222, 1228 (4th Cir. 1998).

The court notes that with regard to all three of the plaintiff's claims, it is an essential element that he was an employee of NASA. The court notes that there are significant factual disputes as to whether the plaintiff was a contingent employee of NASA for Title VII purposes. Thus, this issue is not one that can be decided on summary judgment. However, because on a motion for summary

judgment, the facts should be viewed in the light most favorable to the plaintiff, the court will assume, for purposes of this motion only, that the plaintiff was an employee of NASA. As explained in detail below, even if the court makes this assumption in favor of the plaintiff, he still cannot establish claims for hostile work environment and discriminatory or retaliatory discharge. Accordingly, as set forth below, the plaintiff's claims cannot survive summary judgment.

### A.  Hostile Work Environment

In order to state a prima facie case of a hostile work environment claim, the plaintiff must show that: (1) he experienced unwelcome harassment; (2) the harassment was based on his race, color, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.  Baqir v. Principi, 434 F.3d 733, 745-46 (4th Cir. 2006) (citing Bass v. E. I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003)). The Supreme Court has stated that only harassment that is so "severe and pervasive" to alter the conditions of employment and create an abusive working environment constitute a violation of Title VII.  See Clark County School District v. Breeden, 532 U.S. 268, 270 (2001).  Isolated acts, unless extremely serious, that do not unreasonably interfere with an employee's work performance do not constitute Title VII violations.  See id. at 271.  In determining whether a hostile work environment exists, a view of the totality of the circumstances is proper, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993); see also Bass, 324 F.3d at 765.  To amount to a change in the terms or conditions of employment, discriminatory conduct must be extreme.  Faragher v. City

of Boca Raton, 524 U.S. 775, 788 (1998).

Even assuming the truth of plaintiff's allegations, the conduct alleged simply does not rise to the level of creating a hostile work environment.  Specifically, none of the alleged discriminatory acts serve to alter the terms and conditions of employment.  The plaintiff claims that the discrimination began with "prolonged accentuated mispronunciations and misspelling of [his] name," but later became more offensive when he heard phrases such as "useless Russian approach", "a foreigner", "proletariat classification" of materials, "disastrous work", "you should off [sic] been a plumber back at home", and "not American." (Id.)  Plaintiff also alleges that an unnamed secretary stated that she refused to serve "these foreigners [sic] contractors."  For the most part, the plaintiff is not specific as to who made these comments, the circumstances in which they were uttered, or whether such comments were even made to him.

Even assuming that some of these statements could be viewed as referring to his national origin, they are not so severe and pervasive as to alter the terms and conditions of his employment. Furthermore, the comments appear to be isolated incidents. As to Dr. Nemeth's comment that the plaintiff "should have been a plumber back at home", the defendant has submitted evidence that shows that such comment was made to the plaintiff some time after a particularly stressful meeting, and that Dr. Nemeth was sympathizing with the plaintiff by making a joke that the plaintiff would have had less job related stress if he had just been a plumber, instead of a highly educated scientist.

Furthermore, most of the plaintiff's claims regarding the alleged hostile work environment relate to his relationship with Dr. Gates. Even viewing the facts in the plaintiff's favor, the alleged conflict between the plaintiff and Dr. Gates appears to stem from the fierce competition between Dr. Gates's Post Doc, Dr. Odegard, and the plaintiff. This conflict does not appear to have anything to

do with the plaintiff's national origin. The plaintiff's facts demonstrate that there is an overwhelming pressure to excel in the plaintiff's chosen field, and that the plaintiff experienced frustration when his work was not selected to be included in various conferences and publications. The unhappiness experienced as a result of the plaintiff's dissatisfaction and rivalry does not amount to a hostile work environment claim based on his national origin. It appears that the plaintiff has concluded that because Dr. Gates supported Dr. Odegard, who happened to be U.S.-born, that any favoritism that Dr. Gates showed to Dr. Odegard was based on the fact that Dr. Odegard was from the United States and the plaintiff was not.  As to the plaintiff's unsupported claim that Dr. Gates denied him the software to perform his job, the defendant has provided the affidavit of Andrew Srokowski, which shows that when the plaintiff complained about this alleged problem, NASA provided him with copies of any software that he needed for his job.

In addition, the plaintiff seems to complain about a general atmosphere at NASA of "fear and reprisal" towards contractors, which has nothing to do with his national origin. The plaintiff has submitted numerous examples of how he believes contractors in general were not treated with as much respect as NASA employees. However, such incidents are not actionable under Title VII and do not support his hostile work environment claim based on national origin.

Plaintiff has therefore failed to set out any genuine issues of material fact the finding of which could result in a reasonable fact-finder to rule in his favor. Viewed in its entirety, the discrimination that plaintiff alleges is insufficient to meet the standard required to establish a prima facie claim of hostile work environment.

## B. Discriminatory Discharge

The plaintiff also makes a claim of discriminatory discharge alleging that he was terminated

based on his national origin. To establish a prima facie case of discrimination under Title VII, the plaintiff must show "(1) that []he is a member of a protected class; (2) that []he suffered an adverse employment action; (3) that at the time of the adverse employment action []he was performing at a level that met h[is] employer's legitimate job expectations; and (4) that the position remained open or was filled by similarly qualified applicants outside the protected class." Brinkley v. Harbour Rec. Club, 180 F.3d 598, 607 (4th Cir. 1999) (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07 (1993); Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998); Williams v. Cerberonics, Inc., 871 F.2d 452, 455 (4th Cir. 1989)).

With regard to his work at Swales, the plaintiff has established that he is a member of a protected class because he is originally from the Ukraine, and that he suffered an adverse employment action because he was terminated from his job. As to the fourth element, it is unclear from the facts presented whether the plaintiff's position at Swales remained open or was filled by similarly qualified applicants outside the protected class. However, the court finds that it does not have to make this determination because the plaintiff has failed to establish that he was performing at a level that met his employer's job expectations.

The defendant has established through affidavits and depositions that the plaintiff had been using excessive amounts of sick leave and had not been present to do his job. In fact, before the plaintiff was terminated, Andrew Srokowski, a level-3 manager, met with the plaintiff to address this particular issue. The plaintiff sent an email to Srokowski expressing his dissatisfaction with his actions. Still concerned about the status of the plaintiff's work based on his absences and the plaintiff's attitude, Srokowski sent the plaintiff an email requesting that the plaintiff meet with him again and bring  reports regarding his work activities. The plaintiff did not respond to this email and

did not show up for the meeting. Although the plaintiff claims that he did not receive the email until after the meeting, he admits that he did not respond to it even after he received it.

On March 24, 2004, Srokowski sent another email to the plaintiff, this time directing the plaintiff to meet with him the following Monday, March 29, 2004, and to bring his reports. On the morning of Monday, March 29, 2004, the plaintiff did not appear for the meeting, but emailed Srokowski a report for only one of his projects. Furthermore, the plaintiff resigned from another project to which he was assigned. The plaintiff did not have authority to resign from such project. On March 30, 2004, Srokowski responded to the plaintiff's email asking whether the plaintiff was refusing to meet with Srokowski. Furthermore, Srokowski informed the plaintiff that he had only provided him with one of his requested reports, and that Srokowski intended for the plaintiff to include all of his work activities. Srokowski told the plaintiff in a subsequent email that he wanted the reports by close of business March 30. However, the plaintiff responded in a disrespectful tone accusing Srokowski of micro-managing and promoting a hostile work environment. Furthermore, the plaintiff told Srokowski to stop disrupting him if he could not help him to resolve his problems. Srokowski terminated the plaintiff shortly after this incident.[4]

Such gross insubordination with a high level manager demonstrates that the plaintiff is not able to show that he was performing at a level that met his employer's legitimate job expectations at the time of his termination. Not only had the plaintiff stopped attending work, but he repeatedly

---

[4] There remains the question of whether NASA can be attributed with the plaintiff's termination at all, since it was Andrew Srokowski, Swales Program Manager, who actually fired the plaintiff. However, because the court has assumed for purposes of this motion that the plaintiff was an employee of NASA and that NASA had some control over his actions, the court has not used this fact against the plaintiff for the purposes of establishing a prima facie claim of discriminatory discharge.

refused to meet with one of his supervisors when specifically asked to do so. Furthermore, he resigned from one of his assigned projects without authorization. Therefore, the plaintiff is not able to show that he was meeting his employer's legitimate job expectations and is not able to state a prima facie case of discriminatory discharge.

Alternatively, the plaintiff claims that in 2002 he was discharged from ICASE Institute based on national origin discrimination. This claim is also without merit. After reading the parties' briefs, it appears that the plaintiff's position at ICASE did not remain open because NASA withdrew the funding for the plaintiff's project. Although the plaintiff claims that it was Dr. Gates, a NASA employee, who sabotaged his work to get his funding withdrawn, the plaintiff admits that it was NASA management that helped the plaintiff get his subsequent position at Swales, also a NASA contractor. Accordingly, the allegation that NASA somehow discriminated against him in his termination from ICASE Institute is without merit.

### C. Retaliatory Discharge

The plaintiff also maintains that NASA influenced Swales' decision to terminate him in retaliation for the charges he filed with the NASA EEO Office. In setting forth a prima facie case, the plaintiff must show: (1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that there was a causal connection between the protected activity and the adverse employment action. See King v. Rumsfeld, 328 F.3d 145, 150-51 (4th Cir. 2003). The court finds that even if the plaintiff is able to establish a prima facie case of retaliation, he is not able to rebut NASA's non-discriminatory reasons for his termination.

First, this court finds that the plaintiff engaged in a protected activity when he asked the NASA EEO office to engage in a review of his allegations, even though he had not filed an official

complaint at that time.  Second, he suffered an adverse employment action when Swales' Program Manager, Andrew Srokowski, terminated his employment.[5]  However, this court questions whether the plaintiff has offered sufficient evidence to establish a causal connection between the protected activity and the adverse employment action. The only support that the plaintiff has offered to show the causal connection is that he was fired subsequent to contacting the NASA EEO Office about his informal complaint. None of the plaintiff's formal complaints to the EEOC or the VCHR can satisfy the causal connection element because they all occurred after his termination. Furthermore, the plaintiff's claim that NASA withheld software in retaliation for his February 2004 informal complaint to the NASA EEO office is without merit because the plaintiff claims that he was already without the software before his February 2004 complaint.

    Although temporal proximity can establish a causal connection for purposes of satisfying the prima facie case, the temporal proximity between the events must usually be very short.  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 274 (2001) (noting that cases that accept mere temporal proximity between protected activity and adverse employment action as sufficient evidence of causality to establish a prima facie case hold that temporal proximity must be very close); Hooven-Lewis v. Caldera, 249 F.3d 259, 278 (4th Cir. 2001) (finding that six-month lag negated any inference of causation).  In this case, the plaintiff contacted the NASA EEO office in February 2004.

---

[5]Again, the court notes that it is questionable whether NASA took any adverse employment action against the plaintiff because it was actually a Swales manager who terminated his employment. However, because there is a factual dispute as to whether the plaintiff was a contingent employee of NASA, and the plaintiff claims that NASA managers "effectively" fired him, then the court will assume for purposes of this motion only that the plaintiff was a contingent employee of NASA and that NASA managers caused his termination. However, once again, the court notes that it is not making this finding, but simply assuming these facts for this motion in order to show that even if the plaintiff could prove these points, his claims would still fail.

He was terminated approximately two months later. This two month lag is arguably short enough to constitute a causal connection.

However, even if the court were to give the plaintiff the benefit of the doubt and find that he has established a prima facie case of retaliation, his claim would still not survive summary judgment because he has failed to provide sufficient evidence to rebut the defendant's non-discriminatory reason for his termination: his failure to attend work as required, his repeated refusal to meet with upper level management to discuss his progress, his gross insubordination and disrespectful tone towards management, and his unauthorized resignation from one of his projects. When an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, "it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Hawkins v. PepsiCo Inc., 203 F.3d 274, 279 (4th Cir. 2000) (citing DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998)).  Furthermore, the court will not review the "wisdom or folly" of the defendant's business judgment, or second guess its legitimately based personnel decisions.  See Beall, 130 F.3d at 620; Jiminez v. Mary Washington College, 57 F.3d 369, 383 (4th Cir. 1995).  Thus, because the defendant has set forth legitimate non-discriminatory reasons for discharging the plaintiff, and the plaintiff has not rebutted these reasons with anything other than his own self-serving conclusions, the plaintiff's claim for retaliation must fail.  See Price v. Dept. of Health and Human Services, 380 F.3d 209, 215 (4th Cir. 2004) (explaining that a plaintiff must be able to make a strong showing of pretext in order to survive summary judgment.).  To defeat summary judgment, the plaintiff must present admissible evidence that is more than self-serving opinions or speculation.  See McCain v. Waste Mgmt., 115 F. Supp. 2d 568, 574 (D. Md. 2000).  Accordingly, the court finds that the plaintiff has not produced sufficient

24

evidence to permit a rational fact finder to conclude that the stated reasons for the defendant's decision are a pretext for such discrimination.  Karpel, 134 F.3d at 1229.

### V. Conclusion

Rule 56 mandates summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-23. The court concludes that the defendant has carried its burden of establishing that, even viewing the record in the light most favorable to the plaintiff and assuming that the plaintiff is an employee of NASA for purposes of the motion, no genuine issues of material fact exist in this case because the plaintiff has failed to establish several essential elements of his claims. Celotex Corp., 477 U.S. at 322-24. Accordingly, due to the plaintiff's failure to present evidence to create genuine issues of material fact, the court **GRANTS** the defendant's motion for summary judgment.

In addition, because of the plaintiff's pro se status, and because the court reviewed the plaintiff's second response brief in its analysis of the issues in this case, the court **DENIES** the defendant's motion to strike the "Plaintiff's Response to Oppose Defendant's Reply in Support of Summary Judgment". Thus, the Clerk is **DIRECTED** to file the plaintiff's brief, even though he did not receive permission from this court to file it. The Clerk is also **DIRECTED** to redact the plaintiff's social security number from any exhibits in the file.

The court **ADVISES** the pro se plaintiff that he may appeal from this Order within sixty (60) days of the date of this Order by forwarding a written notice of appeal to the Clerk of the United

States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia, 23510.

The Clerk is **REQUESTED** to mail copies of this order to the pro se plaintiff and counsel for the defendant.

**IT IS SO ORDERED.**

/s/ Jerome B. Friedman
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
August 16, 2006